FRANK K. SPAIN and MARGARET H. SPAIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Spain v. Commissioner
Docket No. 6141-75.
United States Tax Court
T.C. Memo 1978-270; 1978 Tax Ct. Memo LEXIS 237; 37 T.C.M. (CCH) 1158; T.C.M. (RIA) 78270; July 24, 1978, Filed *237 Respondent moved to amend the pleadings to conform with the evidence. Held,section 6214(a) does not give respondent an unqualified right to amend his answer at anytime during the course of the trial. Held further, because the facts do not support respondent's motion, it is denied. Held further, the value of assets distributed by Alabama to petitioner determined. Held further, the loan of $ 150,000 by Florida to petitioner was a bona fide transaction separate and apart from the exchange of assets for stock between those same parties. Held further, the amount of deductible attorneys' fees and materials and supplies for the years in issue determined. Held further, underpayment of taxes not due to negligence or intentional disregard of rules and regulations. James P. Knight, Jr. and Leonard D. Van Slyke, Jr., for the petitioners. Vallie C. Brooks, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACTS AND OPINION STERRETT, Judge: Respondent, on April 9, 1975, issued a statutory notice in which he determined deficiencies in, and additions to, petitioners' Federal income tax as follows: 6653(a) Year Ended
Tax
Addition to Tax
12/31/70
$ 149,239.82
$ 7,461.99
12/31/71
41,336.93
2,066.85
12/31/72
146,705.62
7,335.28
After concessions by the parties the following issues remain for our consideration: (1) whether respondent may amend the pleadings to conform with the evidence; (2) whether petitioner correctly valued the assets distributed to him by Alabama; (3) whether the loan by Florida to petitioner was actually a sale of assets; (4) whether certain legal fees paid by the proprietorship are deductible; (5) whether the purchase of materials and supplies *239 by his proprietorship constituted an ordinary and necessary business expense; and (6) whether a negligence penalty is applicable to the deficiencies due from petitioners. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Frank K. Spain and Margaret H. Spain were husband and wife during the years in issue. They are now divorced. At the time the petition herein was filed Frank K. Spain resided in Tupelo, Mississippi and Margaret H. Spain resided in Palm Springs, California. For each of the calendar years 1970, 1971, and 1972 petitioners filed a joint return, using the cash method of accounting, with the internal revenue service center, Chamblee, Georgia. Margaret H. Spain is a party to this action only because she joined in the filing of these returns and, accordingly, Frank K. Spain will hereinafter be referred to as petitioner. Petitioner is a registered professional engineer. He received a B.S. in engineering from Mississippi State University. He has been in the microwave communications business since 1957. At that *240 time there were a limited number of people involved in microwave communications, a field which remains limited to approximately 20 persons. Microwave is a very short electromagnetic radiation which falls within the same category as the radiation used in radios, F.M., and television. A microwave, however, has a much higher frequency and is transmitted by a well defined beam, strictly by line of sight. Miscellaneous common carriers relay television signals through the use of a wide band of microwave transmission. A typical microwave repeater station consists of a tower, an antenna, a number of microwave receivers, some electronic processing equipment, and microwave transmitters. The towers are generally erected at intervals of approximately 25 miles, although in the west the distance may extend as far as 100 miles. The antennas pick up the signal which is demodulated, turned into an electric signal, by the receivers. The signal is then put into microwave transmitters for transmission to the next microwave station. The unit is normally powered by 110 or 220 volt commercial power, although motor generators are occasionally used to supply power. The signals are sold by the common *241 carrier to Community Antenna Television Systems (cable) or to television stations, its ultimate customers. During the years in issue petitioner operated Microwave Service Company (hereinafter MSC) as a sole proprietorship. MSC operates as a miscellaneous common carrier of microwave signals under the rules and regulations of the Federal Communications Commission (hereinafter FCC). During the years involved MSC operated 164 locations involving 46 transmitting locations.Three or four of the Mississippi locations were owned by MSC, the remainder were leased. Although it had operations in 12 states it basically operated in Tennessee, Alabama, Mississippi, Texas, California, Oregon, Washington, Montana, Illinois and Iowa. Petitioner also owned all of the outstanding stock of Alabama Microwave, Inc. during the years in issue (hereinafter Alabama). Alabama was incorporated under the laws of the state of Alabama on June 4, 1962. Its principal place of business was Tupelo. Alabama is also a miscellaneous common carrier providing microwave services under licenses and permits issued by the FCC. The directors of Alabama during the years before us were petitioner, John E. Clark, and *242 Paul A. Moore who served as president, vice-president and secretary-treasurer, respectively. WTWV, Inc. (hereinafter WTWV) was organized under the laws of the state of Mississippi in 1956. Its principal place of business is Tupelo where it operates a television station under a license granted by the FCC. During the years in issue petitioner owned 60 percent of the outstanding stock in WTWV. Of the remaining stock petitioner's father, W.D. Spain, owned 20 percent, and Margaret H. Spain owned 10 percent. The directors of the corporation were petitioner, John E. Clark and Paul A. Moore who also served as president, vice-president and executive vice-president, respectively. Microwave Service Company of Florida, Inc. (hereinafter Florida), another miscellaneous common carrier, is a corporation which was organized under the laws of Delaware in October of 1970. During the years in issue its directors were petitioner, John E. Clark and Paul A. Moore, who also served as its president, vice-president and secretary, respectively. Petitioner originally owned 100 percent of the outstanding stock in Florida, but by mid 1971 he owned 51 percent of such stock. Miscellaneous common carriers *243 operate under supervision of the FCC. The normal procedure is for the carrier to find a customer needing service; obtain its business or letter of intent; obtain site options; prepare FCC documents covering engineering, financing, legalities, FAA air clearance and other pertinent information; file the application with the FCC; then wait, usually three to six months, for approval. Once construction approval is obtained the carrier must order the necessary equipment, exercise the site options, construct buildings and towers, install the equipment and run performance checks. At that point the carrier will file a license application with the FCC. Within thirty days the carrier will normally receive the FCC license at which time it will commence service to the customer. The carrier is then responsible for the total operation and maintenance of the microwave transmission. Until the June 3, 1971 release of FCC docket number 18920 the FCC's policy was to give a carrier having operating facilities and licenses a right of first refusal with respect to the provision of additional facilities in that geographical location. Because American Telephone and Telegraph Company (hereinafter AT *244 & T) already had a nationwide communication system the miscellaneous common carriers first inroads were allowed only because AT & T found it more profitable to sell their services on a channel by channel telephone basis rather than a wide band picture basis; 1,800 telephone conversations can be run down the same facilities needed to run one picture channel. The FCC priority policy was also applicable to the establishment of services by the miscellaneous common carriers. Therefore, petitioner made a special effort to acquire facilities all over the United States. In 1969 the FCC granted permission for MCI Communications Corporation (hereinafter MCI) to establish a communications system between Chicago and St. Louis in competition with AT & T. This act encouraged the various miscellaneous common carriers to negotiate amongst themselves for the formation of a network of regional microwave systems capable of providing a national communication system that would compete with AT & T. MCI is a corporation engaged in the microwave service business with headquarters in Washington, D.C. MCI's purpose, when the company was organized in 1968 until the middle of 1971, was to develop regional *245 corporate entities, each of which would sponsor a common carrier in that section of the country. These companies would interconnect with each other, thereby providing national long distance communication services. MCI solicited investors who had experience and expertise and who were operating microwave systems. Its chief executive officer is William A. McGowan. MCI primarily provides private two-way communication systems in competition with AT & T. MCI successfully put together 16 separate corporations aligning MCI with established regional carriers. In so doing MCI joined with petitioner in two areas, Florida and midsouth Mississippi. Issues 1, 2 and 3. Transfer of Assets.
The joinder of MCI and petitioner was the result of extensive, arm's-length bargaining between petitioner and McGowan over a period of approximately two years. The negotiations culminated in a series of agreements executed on June 18, 1970, subject to FCC approval. These agreements covered the creation of Florida, options for MCI's acquisition of other of petitioner's facilities and licenses; employment of petitioner by two corporations in the MCI group, MCI-Southeast Communications, Inc. (hereinafter *246 Southeast) and MCI Mid-South, Inc. (hereinafter Mid-South); and purchase of facilities by Mid-South. The options to purchase the various microwave systems in Texas, Missouri and Illinois were never exercised. The creation of Florida was contracted for by Southeast and petitioner. Petitioner was to transfer facilities then owned by Alabama which were situated in the state of Florida in exchange for 1,000 shares of common stock. These stations had been purchased by Alabama on June 2, 1969 for consideration of $ 110,000. At that time there were four customers subscribing to the use of the system. By the time Florida was created two customers had cancelled their service contracts. Southeast was obligated to purchase 400 shares of Florida stock for either $ 200,000 or the issue of 41 percent of its stock. Southeast was also obligated to exchange 10 percent of its authorized stock to petitioner in exchange for 90 shares of Florida stock. Pursuant to the contract petitioner caused Alabama to disttribute to him its microwave systems located in the state of Florida. He then transferred these assets to the newly created Florida in exchange for 1000 shares of common stock. Southeast *247 elected to transfer funds rather than its common stock. It eventually transferred $ 200,000 to Florida in return for 400 shares of Florida's common stock. These funds were used to redeem 400 shares of petitioner's stock on April 14, 1971. Petitioner then transferred 90 shares of Florida stock to Southeast in return for 10 percent of the total outstanding amount of its stock (100,000 shares). Thus, as a result of these transactions, petitioner owned 51 percent of Florida (510 shares) and 10 percent Southeast (100,000 shares) and Southeast owned 49 percent Florida (410 shares). The employment agreements each provided that petitioner would act as president of the relevant corporation. With respect to the Southeast agreement petitioner agreed to advise and assist in the prosecution of proposed applications for establishment of a customized communications common carrier. For these services he was to be paid $ 12,000 per annum. He then agreed not to compete with Southeast while employed thereby. In addition, this contract provided for petitioner to serve in the same capacity with respect to Florida for an additional $ 12,000 per annum. With respect to Mid-South petitioner agreed to *248 manage and operate the existing common carrier facilities and to interconnect certain facilities of Alabama with the facilities of Mid-South subject to FCC approval. For these services petitioner was to be paid $ 24,000 per annum but had to bear all expenses incidental thereto. These agreements were cancelled on March 15, 1972. The remaining agreement provided for the sale of facilities owned by petitioner and MSC and those of Alabama remaining after the distribution of its Florida assets to Mid-South. In return Mid-South agreed to pay $ 300,000 subject to financing. Mid-South also agreed to deliver 127,500 shares (51%) of its outstanding voting stock in exchange for $ 1,275. On the strength of the contract for the sale of the Alabama facilities (valued by the parties at $ 275,000 of the $ 300,000 total) Mid-South loaned Alabama $ 150,000 on August 4, 1971 to be repaid in one year or at the time of closing. Petitioner did eventually acquire 51 percent of Mid-South but in the meantime MCI doubled Mid-South's capitalization so that on November 26, 1970 petitioner purchased 51 percent of the stock (255,000 shares) for $ 2,550. The remainder of the contract was terminated and *249 cancelled on March 15, 1972. In the interim between the execution of these agreements on June 18, 1970 and the termination agreement of March 15, 1972 the FCC, on June 3, 1971, released docket number 18920 which opened the microwave communications field by retracting the FCC's priority policies and encouraging competition. Because the premise on which the now partially performed June 18, 1970 agreements were based was no longer viable, the parties to those agreements chose to cancel the June 18th agreements and restructure their future relationships. When the old contracts were terminated on March 15, 1972 a series of new contracts restructuring the various corporations were executed. Pursuant to these agreements: Southeast and Mid-South were merged into MCI; petitioner exchanged his 255,000 shares of Mid-South for 44,800 shares of MCI, 100,000 shares of Southeast for 30,000 shares of MCI, FCC applications filed in California during 1970 for 100 shares of MCI and cancellation of an agreement with respect to increased revenue of Florida for 100 shares of MCI and the employment agreements with Southeast and Mid-South were replaced with an employment agreement with MCI. On *250 July 31, 1972 petitioner transferred certain microwave stations which had been in part the subject of the cancelled sale of Alabama facilities valued at $ 156,000 to Mid-South to Florida in exchange for 312 shares of common stock. At the same time Southeast agreed to purchase an additional 300 shares of Florida stock for $ 150,000. Petitioner then borrowed this sum from Florida and used it to repay the outstanding debt of Alabama to the now defunct Mid-South. Issue 4. Attorneys' Fees.
Of the amounts deducted as ordinary and necessary business expenses by MSC in the taxable years 1970, 1971 and 1972 respondent in his notice of deficiency disallowed attorneys' fees of $ 20,420.25, $ 16,631.84, and $ 11,797.73, respectively, as expenditures which were either capital in nature or not ordinary and necessary expenses of that business. It has been stipulated that petitioner paid $ 18,470.55, $ 16,590.16 and $ 11,797.73 to various law firms in the respective years 1970, 1971 and 1972. [1] Petitioner concedes that $ 500 paid in 1970 was correctly disallowed by respondent. Respondent concedes the deductibility of the following amounts incorrectly charged to attorneys' fees in 1970: *251 Amount
Paid To
$ 200.00
Charles Snow
120.00
Carl Bagwell
20.00
W.F. Trap
24.50
State Officers Journal
$ 364.50
A significant portion of the disputed deductions concerns amounts paid during the years in issue to a law firm which did work for petitioner, MSC, Alabama, Florida and MSC, Inc. The amounts paid to that firm may be broken down as follows: Amount
Amount
Capital
Ordinary Year
of check
Attributable to MSC
Expense
Expense
1970
$ 1,461.70
$ 600.00
$ 600.00
$ 00
516.00
00
00
00
2,718.78
75.00
75.00
00
1,644.67
600.00
600.00
00
707.33
260.00
100.00
160.00
4,574.89
100.00
100.00
00
5,765.06
450.00
450.00
00
$ 17,388.43
$ 2,085.00
$ 1,925.00
$ 160.00
1971
$ 1,255.05
$ 200.00
$ 200.00
$ 00
457.00
00
00
00
4,143.98
900.00
900.00
00
2,206.08
275.00
175.00
100.00
2,0 51.29
700.00
700.00
00
2,410.46
450.00
450.00
00
647.70
175.00
175.00
00
874.69
525.00
525.00
00
1,398.91
850.00
850.00
00
50.00
50.00
50.00
00
$ 15,495.16
$ 4,125.00
$ 4,025.00
$ 100.00
1972
$ 1,380.03
$ 875.00
$ 875.00
$ 00
551.37
200.00
00
200.00
882.74
125.00
125.00
00
5,001.64
475.00
475.00
00
1,480. 59
150.00
150.00
00
562.55
100.00
100.00
00
463.28
150.00
150.00
00
883.96
375.00
375.00
00
391.60
325.00
00
325.00
11,597.76
$ 2,775.00
$ 2,250.00
$ 525.00
*252 In addition to the amounts attributable to MSC these payments reflect miscellaneous expenses of $ 100 paid in 1970, miscellaneous expenses of $ 2,025 and costs with respect to rule making proceedings involving the use of satellites of $ 1,300 paid in 1971, and miscellaneous expenses of $ 3,275 paid in 1972. [2] They also reflect a total of $ 1825 paid in the years in issue in connection with the Mississippi Educational Television contract. This contract was terminated in 1972. The amounts remaining in controversy which were deducted as attorneys' fees for the years in issue are $ 244.62 paid to a law firm in 1970 for response to a claim filed against MSC with respect to the cost of erection of a tower, preparation of leases, discussions with respect to power increases, revision of service contours and the Dubuque systems; $ 576.60 paid to a law firm in 1971 for the procurement of license renewals; $ 818.00 paid in 1971 for a survey and maps for a proposed television tower site; and $ 1,000 paid to an attorney in 1971 *253 for an answer and counterclaim to a suit for loss of business. Issue 5. Materials and Supplies.
Petitioner deducted $ 48,943.53, $ 66,134.81 and $ 51,580.96 as materials and supplies purchased by MSC in the respective years 1970, 1971 and 1972. In his notice of deficiency respondent disallowed $ 7,029.81, $ 22,366.63 and $ 23,469.29 as amounts found to be either capital expenditures or not ordinary and necessary to that business. The parties have stipulated that the following amounts constitute capital expenditures on which depreciation and investment credits are allowable: Year
Amount
1971
$ 7,421.22
1972
3,639.88
They also agreed that the following amounts were correctly disallowed as were the investment credits thereon, but that depreciation thereon is allowable: Year
Amount
1970
$ 1,312.50
1971
388.75
1972
3,400.00
Petitioner concedes that an additional $ 6,000 deduction taken in 1972 was correctly disallowed, while respondent concedes deductions totaling $ 1,633.09 and $ 2,200.00 for the taxable years 1971 and 1972. The following amounts paid in the year shown remain in controversy: [3] Year
Amount
1970
$ 5,757.31
1971
13,315.66
1972
7,614.68
*254 The major portion of these amounts was expended by MSC for the purchase of various and sundry electrical parts. It is MSC's policy to expense the cost or replacement parts with respect to its microwave stations. In the east MSC kept station wagons stocked with such parts. In the west, where access to the mountaintop stations was limited due to snow, the stations themselves were stocked with a complete set of spare parts. Hicks Tower Service dismantled two towers for $ 1,500 which amount was paid June 18, 1970. The removal of the towers was required by the terms of the lease. The anchors, base and some other parts of the towers cannot be reused. Although the remainder of the towers are reusable, MSC normally abandoned that type of equipment. MSC paid Nina Tant $ 5,276 on October 15, 1971. Nina Tant was disposing of her husband's tower and rigging business as the executor of his estate. MSC purchased some beacon lights, riging equipment and tower sections. The rigging equipment *255 was turned over to an employee in return for maintenance work (rigging work, painting towers and changing light bulbs). The other purchases were used as replacement parts. In May of 1972 Paul Moore represented MSC in Los Angeles, at the NBC Annual Affiliates Convention. He incurred an expense of $ 309.98 while attempting to generate business from those attending the convention. MSC purchased sound subcarrier equipment from RCA in May of 1972 incurring an expense of $ 1,500. The equipment was submitted to tests and its components analyzed to determine whether it would fulfill their needs. This equipment was not placed in service. OPINION Issue 1. Respondent's Motion.
On July 20, 1977, at the end of the initial hearing of this case, respondent moved to amend the pleadings to conform with the evidence alleging that petitioner's dealings with MCI were in substance an agreement whereby MCI obtained petitioner's services. The motion was denied. Respondent renewed the motion when the hearing was continued on September 19, 1977. At that time a ruling on the motion was deferred to the time of the writing of this opinion. Respondent contends that he has an unqualified *256 right to amend his answer anytime during trial by reason of section 6214(a), I.R.C. 1954. [4] We do not agree.
Section 6214(a) gives the Tax Court jurisdiction to determine the correct amount of the deficiency even if such amount exceeds the amount of deficiency stated in the deficiency notice. The mere provision of jurisdiction does not establish a mandate requiring redetermination where such redetermination is not warranted by the facts. Commissioner v. Estate of Long,304 F.2d 136, 141 (9th Cir. 1962). Section 7453 provides for the prescription of rules governing the trial of cases by the Tax Court. See Koufman v. Commissioner,69 T.C. 473, 476 (1977) *257 and case cited therein. Rule 41(a) of the Tax Court Rules of Practice and Procedure allows for amendment of the pleadings after the case has been placed on a trial calendar "when justice so requires." [5]
Petitioner's objection to respondent's motion is based on the premise that "great injustice will be incurred by petitioners if the motion is granted." The factors which have been employed to determine whether consideration of new issues or new reason will prejudice the petitioner in the presentation of his case are the elements of surprise and substantial disadvantage. Estate of Horvath v. Commissioner,59 T.C. 551, 555 (1973) and cases cited therein. When the manner in which the statutory notice and the pleadings are drawn is compared to the issues raised by respondent's motion it is obvious that the element of surprise *258 exists. The statutory notice takes issue with the fair market value of assets distributed by Alabama to petitioner. Petitioner reported such value to be $ 175,000 while respondent determined a value of $ 500,000. The petition puts the fair market value in issue and the answer responds only to that point. In contrast, respondent's motion takes issue with the economic reality of the contracts leading up to the sale, and concludes that such agreements actually were for the attainment of petitioner's services by MCI. The statutory notice treated the $ 150,000 loan from Florida to petitioner as a sale of equipment. The petition takes issue with respondent's determination that a sale occurred. Again the answer responds to the petition. Respondent's motion treats this amount as a purchase of petitioner's services. The motion also suggests that petitioner incurred ordinary income because MCI purchased petitioner's applications to the FCC for a chain of microwave stations on the west coast although he elsewhere agrees that expenses incurred with respect to such applications assume the capital character of the applications. Although we do not find that petitioner would be substantially *259 disadvantaged in the presentation of his case by our granting respondent's motion, neither do we find that justice requires amendment of the pleadings. The facts do not support respondent's motion. The testimony of both parties to the four June 18, 1970 agreements affirms the bona fide nature of the sale of assets by petitioner (Alabama) to Florida. Two of the remaining agreements of that date encompass the performance of services by petitioner for MCI Mid-South and MCI Southeast for $ 24,000 per annum and $ 12,000 per annum, respectively. Such amounts to be paid for petitioner's services appear far more realistic than the $ 810,000 figure that is computed under respondent's strained approach. His argument that the 1972 restructuring of relations between petitioner and MCI is not bona fide fails to comprehend the radical change in circumstances due to the release of FCC docket number 18920. We deny respondent's motion to amend the pleadings. The issues remaining for our determination in connection with petitioner's transfer of assets are factual in nature: (a) the fair market value of assets distributed by Alabama to petitioner on September 26, 1970 with respect to the organization *260 of Florida, and (b) the gain realized on the transfer of assets by petitioner to Florida on July 31, 1972. Issue 2. Distribution by Alabama.
The value used by petitioner in computing his gain on the distribution by Alabama was $ 175,000. Respondent contends that the actual value was $ 500,000. Petitioner had purchased the assets, both tangible and intangible, on June 2, 1969 for $ 110,000. The two expert witnesses presented by petitioner valued these assets at $ 100,000 and between $ 125,000 and $ 150,000 using the cash flow method of valuation, the difference in value was due to a variance in predicted growth and computation of the cost of replacement of the component parts of the system. Respondent did not value the assets themselves. Instead he used the $ 500 per share figure used in the June 18, 1970 agreement between petitioner and Southeast with respect to the latter's purchase of 400 shares of Florida stock for $ 200,000. Because this agreement also provided for petitioner's transfer of the Alabama assets in exchange for 1,000 shares of Florida stock, respondent assumed that the assets' value at distribution was $ 500,000 ( $ 500 per share X 1,000 shares). *261 While the large discrepancy between petitioner's valuation ($ 175,000) and respondent's valuation ($ 500,000) gives us pause, the only evidence before us supports petitioner's valuation.His two expert witnesses were both knowledgeable in the microwave field. They used two disparate methods of calculation. We found them to be credible witnesses and have no basis for disbelieving their testimony. Petitioner has carried his burden of proof. Based on the evidence before us and petitioner not having amended his petition to claim a lower value, we find the value of the assets at distribution to be $ 175,000. Issue 3. Transfer of assets to Florida.
Respondent determined that the purported $ 150,000 loan from Southeast to petitioner on July 31, 1972 was not a separate transaction but was a part of the transfer of assets by petitioner to Florida for which he received 312 shares of Florida stock and cancellation of a $ 5,033.40 debt. Petitioner contends that he transferred assets valued at $ 156,000 in exchange for 312 shares of Florida stock plus cancellation of the $ 5,033.40 debt and that the $ 150,000 loan was a separate transaction. We agree. Prior to this contribution *262 of assets petitioner owned 51 percent of the outstanding Florida stock (510 shares) while Southeast owned 49 percent (490 shares). At the time of this contribution of assets valued at $ 156,000 in exchange for 312 shares of stock, Southeast contributed $ 150,000 to Florida in exchange for 300 shares. After these contributions petitioner owned 822 shares or 51 percent of the outstanding stock while Southeast owned 790 shares or 49 percent of the outstanding stock. After considering all the facts and circumstances involved we find that the loan of $ 150,000 by Florida to petitioner was not a part of the July 31, 1972 exchange of assets for stock, but a bona fide transaction having substantial economic effect. The loan was actually a separate part of the restructuring of earlier financial agreements. On August 3, 1971 Mid-South had loaned $ 150,000 to Alabama. After the July 31, 1972 restructuring of the relationship between MCI and petitioner, Mid-South no longer existed. The assets contributed to Florida were the assets of Alabama on whose value the loan by Mid-South had been based. Petitioner used the money borrowed from Florida to repay the debt of Alabama to Mid-South. Although *263 there is a definite relationship between the timing of the stock issue and the loan [6] it is just as obvious that the two were separate transactions. Issue 4. Attorneys' fees.
Attorneys' fees which have a direct connection with the carrying on of a trade or business are deductible if they are found to be ordinary and necessary. Kornhauser v. Commissioner,276 U.S. 145, 152 (1928). Conversely, those amounts expended for attorneys' fees with respect to a capital expenditure should be capitalized. Petitioner, on brief, concedes that legal fees paid for the acquisition of licenses constitute a capital expenditure. The table set forth in our findings of fact reflects this distinction. We find that the amounts listed under ordinary expenses are deductible in the respective years. That table does not, however, reflect either the amount of fees paid with respect to the satellite communications or the miscellaneous fees paid during the years in issue which should be apportioned to MSC. Under the Cohan rule we are required to make an approximation of these amounts in accordance with our *264 best judgment. Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930). The rule making proceeding with respect to provision of communication services by domestic satellites affected all four companies represented by the firm. Therefore, we will apportion one-fourth of the $ 1,300 spent in 1971 ( $ 425) to MSC. We then apportion the miscellaneous fees for each year based on a ratio of fees previously found to be ordinary expenses of MSC divided by total fees paid less miscellaneous expenses times the miscellaneous expense. Thus, an additional $ 1.00, $ 81.00 and $ 196.50 are deductible by MSC as attorneys' fees in the respective years 1970, 1971 and 1972. The amounts expended for legal fees in connection with the Mississippi Educational Television, although capital in character, are deductible in 1972 as a loss upon termination of the contract in that year. Petitioner claims that the $ 576.60 expended in 1971 on attorneys' fees in connection with license renewals is deductible as an ordinary and necessary expense although he agrees that acquisition of licenses constitutes a capital expenditure. The issue behind his claim is whether intangible operating rights *265 will last for an indefinite period. We must assume that they will. Knipe v. Commissioner,T.C. Memo. 1965-131. There is no evidence before us to suggest that the licenses applied for were for a period of 1 year or less or that such licenses would not be renewed indefinitely. See, Toledo TV Cable Co. v. Commissioner,55 T.C. 1107, 1117 (1971), affd. 483 F.2d 1398 (9th Cir. 1973). The FCC licenses have the characteristics of a capital asset. See, P. Liedtka Trucking, Inc. v. Commissioner,63 T.C. 547, 555 (1975). Therefore the attorneys' fees attributable to the operating rights must be characterized as capital assets rather than as ordinary and necessary expenses. The $ 818.00 paid in 1971 expended for a survey and maps in connection with a proposed television tower site is not deductible by petitioner in the year paid. Aside from the fact that petitioner incorrectly categorized this amount as an attorney's fee, this expenditure is attributable to WTWV rather than MSC and the cost of acquiring the site is capital in character. The $ 244.62 and $ 1,000 deducted in 1970 and 1971, respectively, were paid for various *266 services some of which were ordinary and necessary to carrying on a trade or business and some of which were capital in character. We are unable to decipher which are which. The lack of specificity with respect to the characterization of these expenditures forces us to uphold respondent's determination. Welch v. Helvering,290 U.S. 111, 115 (1933). Issue 5. Materials and supplies.
Petitioner presented extensive, credible and uncontroverted testimony to the effect that the parts purchased giving rise to this issue were replacement parts designed for common carrier frequencies. Television stations do use microwave transmissions in their operations; however, the frequencies used are not the same and the parts are not interchangeable. Although respondent contends that these parts were purchased by MSC for WTWV, petitioner explained that parts purchased from JSC Electronics at that time were listed as sold to WTWV on the invoices because WTWV had previously established a line of credit therewith. Use of these replacement parts did not increase the value of the towers. Therefore, we find the following amounts expended for the purchase of replacement parts *267 deductible as materials and supplies: Year
Amount
1970
$ 5,757.31
1971
8,039.66
1972
5,804.70
The amounts remaining in issue are the $ 1,500 paid in 1970 to Hicks Tower Service, $ 5,276 paid in 1971 to Nina Tant, $ 309.98 paid in 1972 to Century Plaza and $ 1,500 paid to RCA in 1972. The amount paid to Hicks Tower Service were for the dismantling and removal of two towers. The towers are capital assets and expenditures related thereto would normally be added to basis. After removal the anchors, base, and some other parts are not reusable. However, petitioner normally abandons even the reusable portions. Although destruction or abandonment would most likely give rise to a deductible loss, without specificity on the record with respect to exactly what assets were destroyed or abandoned and the cost thereof we must uphold respondent's determination of nondeductibility. Welch v. Helvering,supra, at 115. The Nina Tant payment covered the purchase of equipment used for two purposes: replacement of parts and in lieu of wages to an employee for maintenance work. The former is deductible as a cost for materials and supplies in the year *268 paid. The latter is deductible as a cost of labor in the same year. The amount paid to Century Plaza in 1972 for expenses incurred by Paul Moore while attempting to generate business at an NBC Annual Affiliates Convention is also deductible in that year as an ordinary and necessary business expense as is the amount expended to purchase equipment from RCA for testing purposes. Issue 6. Negligence penalty.
Respondent in his notice of deficiency determined that a part of the underpayment of tax for each of the years in issue was due to negligence or intentional disregard of rules and regulations. Consequently he asserted a 5 percent addition to tax for those years under section 6653(a). Respondent based his determination on the size of deductions claimed, the fact that petitioner conceded a significant proportion of the original deficiency, and his assumption that he was correct in his determination of the issues which remained for our decision. We do not find such syllogistic reasoning to be of probative worth. Further, we do not believe that this case justifies imposing a premium on the concessions. Petitioner points out that he hired a bookkeeper who kept a general *269 ledger and journal, had his returns prepared by a CPA and hired a well-known Washington, D.C. law firm for tax advice. Admittedly, there were errors in his calculation of tax due. However, we do not find that the underpayment was due to negligence or intentional disregard of rules and regulations. Decision will be entered under Rule 155.
Footnotes
1. We are aware that these figures, which were stipulated, are not equivalent to the sum total of the individual amounts which remain in issue.↩
2. An additional $ 200 (1/4 of $ 800) paid in 1970 and $ 175 paid in 1972 with respect to negotiations with MCI are attributable to petitioner individually.↩
3. We are aware of the disparity between these amounts, the sum derived when the concessions are subtracted from the original deficiency and the individual amounts discussed in our opinion.↩
4. SEC. 6214(a)↩. Jurisdiction as to Increase of Deficiency, Additional Amounts, or Additions to Tax.-- * * * the Tax Court shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any additional amount, or addition to the tax should be assessed, if claim therefor is asserted by the Secretary at or before the hearing or a rehearing.
5. Respondent actually requested a Rule 41(b)↩ amendment of the pleadings to conform with the evidence. However, the issues raised by respondent's amendment were not tried by the express or implied consent of the parties. Neither was evidence objected to at trial on the ground that it is not within the issues raised by the pleadings.
6. The cash contributed by Southeast was used to fund the loan.↩